

**SIGNED this 18th day of February, 2014.**

_____

**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KLN STEEL PRODUCTS CO., LLC | § | No. 11-12855 |
| DEHLER MANUFACTURING CO., INC., | § | No. 11-12856 |
| FURNITURE BY THURSTON, AND | § | No. 11-12858 |
| 4200 PAN AM, LLC | § | No. 11-13154 |
| | § | |
| Debtors. | § | Chap. 11 |
| | § | _Jointly Administered_ |
| | § | |

| | | |
|---|---|---|
| | § | |
| MICHAEL CIESLA TRUSTEE OF THE | § | |
| KLN LIQUIDATING TRUST, | § | |
|     Plaintiff, | § | |
| | § | Adv. Proc. No. 13-01013 |
| v. | § | |
| | § | |
| HARNEY MANAGEMENT PARTNERS, | § | |
|     Defendant. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this case, the Court must determine whether payments should be recovered by the

trustee of a liquidating trust from restructuring consultants hired to advise a bankrupt business

1

prior to its bankruptcy filing, or whether those payments are protected from recovery by the "ordinary course of business" or "new value" defenses.

At summary judgment, the Court found that most of the contested payments were not avoidable, because they fit snugly within the "ordinary course of business" exception. Now, the Court finds that the remaining amounts are not protected as "ordinary course" payments, and only a small amount is protected by the "new value" exception. The Court also finds that the payments have been properly placed at issue before the court, and that the plaintiff has standing to pursue them.

The Court has considered the Complaint [Dkt. No. 1], Harney Management Partners, LLC's Answer and Affirmative Defenses to Complaint (the "Answer") [Dkt. No. 6], Harney Management Partners, LLC's Closing Statement ("Harney's Closing Statement") [Dkt. No. 38], Plaintiff's Post-Trial Brief [Dkt. No. 37], the presentations made at a trial on this matter held on October 25, 2013 (the "Trial"), all other evidence in the record, and the relevant case law.

## I. JURISDICTION AND CONSTITUTIONAL AUTHORITY

The Court has jurisdiction over this avoidance action pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

But while jurisdiction is certain, the Court's authority under the Constitution to determine the dispute is less so. This uncertainty arises in the wake of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), in which the Supreme Court ruled that at least some matters within the statutory jurisdiction of non-Article III bankruptcy courts nonetheless cannot be constitutionally decided by those courts.

If a creditor has filed a proof of claim in the bankruptcy case, courts are generally confident that an avoidance action (such as this one) targeting that creditor *is* within the Court's

constitutional power, because the "process of allowing or disallowing claims" will usually require deciding the avoidance issue. *Stern*, 131 S. Ct. at 2616; *see Burns v. Dennis (In re Se. Materials, Inc.)*, 467 B.R. 337, 348- (Bankr. M.D.N.C. 2012) (discussing cases). But Harney has not filed a proof of claim,[1] so that avenue to a final judgment appears foreclosed.

Some courts allow bankruptcy courts to enter final judgments upon consent of the parties. *See Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency)*, 702 F.3d 553, 566-70 (9th Cir. 2012), *cert. granted sub nom. Exec. Benefits Ins. Agency v. Arkison*, 133 S.Ct. 2880 (2013) (No. 12-1200). Here, the parties have consented. But the Fifth Circuit has ruled squarely that such consent is ineffective to empower this Court to enter a final judgment under the Constitution. *See Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313, 320 n. 3 (5th Cir. 2013); *BP RE L.P. v. RML Waxahachie Dodge, L.L.C. (In re BP RE, L.P.)*, 735 F.3d 279, 286-91 (5th Cir. 2013). (This issue is currently before the Supreme Court, as *Executive Benefits Insurance Agency v. Arkison*, No. 12-1200.)

So then: The creditor not having filed a proof of claim, and the parties' consent being unavailing, can the Court issue a final judgment in this avoidance action? Since *Stern*, courts have been divided on whether bankruptcy courts can enter final decisions in preference actions under such conditions. *See* Tyson A. Crist, Stern v. Marshall*: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 AM. BANKR. L.J. 627, 663-66 (2012) (collecting cases). The arguments for and against are sound. *See, e.g.*, *West v. Freedom Medical, Inc. (In re Apex Long Term Acute Care—Katy, L.P.)*, 465 B.R. 452, 455-68 (Bankr. S.D. Tex. 2011) (providing extensive discussion of relevant jurisprudence and ultimately

---

[1] This is true so far as the Court can determine; out of the hundreds of proofs of claim that have been filed against KLN, neither Harney nor Harney's counsel is named as claimant.

concluding that preference actions are determinable by bankruptcy courts). The issue appears finely balanced. It is not decisively resolvable without further guidance from the Fifth Circuit or the Supreme Court. Because there is no clear precedent altering the status quo in this respect, the Court will adhere to the pre-*Stern* practice of issuing its ruling on this core matter as a final judgment, as Congress permitted under 28 U.S.C. § 157(b)(2)(F).

If the District Court concludes that this course of action was in error, and that this Court lacks constitutional authority, the "final judgment" can be construed as "proposed findings of fact and conclusions of law," with a final judgment to be entered by the district court. *See* Order of Reference of Bankruptcy Cases and Proceedings at 1-2 (W.D. Tex. Oct. 4, 2013).[2]

## II. <u>BACKGROUND</u>

### A. KLN's Bankruptcy Filing, Plan, and Liquidating Trust

On November 22, 2011, KLN Steel Products Company, LLC, along with several other affiliates (collectively, "<u>KLN</u>"), filed a petition for relief (the "<u>Petition</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). Under the Debtors' Third Amended Chapter 11 Plan of Reorganization (the "<u>Plan</u>") [Dkt. No. 377], as confirmed by this Court [Dkt. No. 419], Michael Ciesla ("<u>Plaintiff</u>") was appointed as liquidating trustee of KLN. Under the Plan, Plaintiff is empowered to pursue certain of KLN's claims, including avoidance claims. *See* Plan §§ 6.5, 6.6 (outlining preserved claims to be pursued by Plaintiff). Whether he is empowered to pursue all of the claims here is a matter of some dispute, and is dealt with below. *See infra* § III.A.1.

---

[2] Some courts have held that the jurisdictional statute governing "core" matters, 28 U.S.C. § 157(b), does not permit such a course of action, and this is another question currently before the Supreme Court in the *Executive Benefits Insurance Agency* case. But this Court need not delve into this issue in light of the clarity of the standing order in this district.

### B.  Pre-Petition Dealings Between Harney and KLN

The Court finds the following facts (which were largely undisputed) concerning the pre-bankruptcy dealings between KLN and Harney Management Partners, LLC ("Harney").

Beginning in February of 2011, Harney provided business consulting and restructuring advisory services to KLN.  At first, services were provided (and paid for) under an engagement agreement dated February 2, which provided for hourly rates of compensation, weekly invoices from Harney covering the prior week's work, and payment to be made "*via wire transfer*" within three business days of each e-mailed invoice.  Def. Trial Ex. 1 (emphasis original).  KLN paid Harney $20,000 as a retainer, under the terms of this agreement.

These initial terms proved onerous to KLN, which was struggling to make ends meet.  Indeed, most payments were made somewhat later than the three business days' deadline contemplated in the engagment letter.

The agreement was modified on April 27, 2011.  Harney agreed to extend the time for payment to ten business days from the invoice date, to cap its weekly bills at $10,000, and to defer payment for services not covered by that capped amount.  Def. Trial Ex. 2.  The February agreement otherwise remained in force, including its requirement of payment by wire transfer.

The April modification was effective until June 13, when the fee cap/deferral component was rescinded, with the contractual relationship otherwise left in place.  Def. Trial Ex. 3.

The next change in circumstances occurred on November 1, when, citing "discoveries we made . . . last week" and "potentially improper financial transactions," Harney resigned.  Def. Trial Ex. 10.  Harney attached a final invoice and requested payment for fees that were already due.

A week later, on November 8, Harney and KLN entered yet another retention agreement,

under which KLN agreed to maintain the $20,000 retainer, and to make payments "*via wire transfer*" within ten business days of invoice.  Def. Trial Ex. 12 (emphasis original).  Harney agreed to cap its charges at $25,000 per week.  The parties also made various arrangements for payments that were already pending.

As evidence at Trial showed, and as helpfully summarized in a chart included in the affidavit of Gregory S. Milligan (an executive vice president of Harney), in addition to the $20,000 retainer paid on Feburary 7, 2011, KLN made numerous payments between Harney's February engagement through KLN's November 22, 2011 bankruptcy filing.  *See* Def. M.S.J. Ex. 1.

Partial or full payments were made on twelve invoices during the 90 days before the filing of the Petition (the "Preference Period").  These are the payments Plaintiff filed suit to recover.  The time and manner of the Preference Period payments may be summarized as follows.  (This summary was introduced and left unchallenged at both summary judgment and at trial, and the Court's analysis of the invoices and evidence of payment supports the conclusions drawn from it.)

*Timing*.  Payments were made an average of 6.25 business days from the invoice date, and in all cases within two to ten days of the invoice date.

*Manner*.  The invoices were paid by wire transfer, with the exception of one by check, and another partially by check and partially by wire transfer.

There was also a final payment made on the day of bankruptcy in the amount of $50,000. There is factual controversy as to the conditions under which this payment was made, with Plaintiff insisting it was extracted under extraordinary and "coercive" circumstances, because (it is claimed) Harney refused to release information crucial to the impending bankruptcy filing until

the payment had been made.

The Preference Period payments can be compared to the payments made prior to the Preference Period. Harney issued twenty-eight invoices during the period February 8 through August 13, and KLN paid these in full or in part during the period February 24 through August 15, 2011 (after which the Preference Period began). The time and manner of these payments may be analyzed as follows.

*Timing*. Payments were made an average of seven business days from the corresponding invoice date, and they were made in all cases within three to nineteen days from the date of the corrsponding invoice date.

*Manner*. Payments were made by wire transfer. Four times, two invoices were paid at once (i.e., in one transfer), while two other invoices were divided over two payment dates (i.e., paid piecemeal).

### C.  This Litigation

#### 1.  *The Pleadings*

In the Complaint, Plaintiff sought to recover payments made during the Preference Period in the sum of "at least" $168,594.85, as preferential transfers recoverable pursuant to section 547(b) of the Bankruptcy Code. Although Plaintiff never amended this Complaint, it later became clear from his filings and representations to the Court that he wished to recover another payment made in the 90 days prior to filing, in the sum of $50,000, for a total attempted recovery of $218,594.85. (Whether or not Plaintiff successfully put this additional amount in play, and whether Plaintiff has standing to claim it in light of the Plan and Disclosure Statement, are discussed below.)

In the Answer, Harney asserted, among other things, certain affirmative defenses,

including that the payments were made in the ordinary course of business and that it extended new value to KLN after the payments were made, thus protecting the payments from avoidance.

### 2. *Summary Judgment*

#### a. Harney's Motion and Plaintiff's Response

It was on the basis of the ordinary course of business defense that Harney sought summary judgment (the "Motion for Summary Judgment") [Dkt. No. 12]. Plaintiff filed a Response to Defendant's Motion for Summary Judgment (the "Response to Summary Judgment") [Dkt. No. 18], Harney filed a Reply in Support of Its Motion for Summary Judgment [Dkt. No. 21], and the Court held a hearing held on July 11, 2013 (the "Summary Judgment Hearing").

In order to win summary judgment on this affirmative defense, on which Harney bore the burden of proof, it had to show that there was no genuine issue as to any fact material to any element of its defense. FED. R. CIV. P. 56; *Goldberg v. Graybar Elec. Co. (In re ACP Ameri-Tech Acquisition)*, No. 10-9029, 2012 WL 481582, at *1-*2 (E.D. Tex. Feb. 14, 2012) (applying this standard); *Yaquinto v. Arrow Fin. Serv. (In re Brook Mays Music Co.)*, 418 B.R. 623, 627-29 (Bankr. N.D. Tex. 2009) (ruling on preference action at summary judgment). At summary judgment, the Court must "view[ ] the facts and all inferences to be drawn therefrom in the light most favorable to the nonmovant"—here, Plaintiff. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). But, while factual controversies must be resolved in favor of Plaintiff, summary judgment should be denied "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Id.* As explained below, there were no "contradictory facts" as to most of the transfers, which is why Harney's evidence carried the day at the summary judgment stage.

Establishing its affirmative defense required Harney to make two demonstrations:

(i) Debt incurred in ordinary course.  Harney was obligated to show that each contested transfer "was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee."  11 U.S.C. § 547(c)(2).

(ii) Payments made in ordinary course.  Harney had to show that each payment was *either* "made in the ordinary course of business or financial affairs of the debtor and transferee," the so-called "subjective prong"; *or* was "made according to ordinary business terms," the so-called "objective prong."  11 U.S.C. § 547(c)(2)(A) (subjective prong), (B) (objective prong).  This defense used to require that both prongs be met, but under the 2005 amendments to the Bankruptcy Code, only one of these two prongs need be proven for the defense to be successful. *See G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co.)*, 439 F.3d 233, 240 n. 4 (5th Cir. 2006) (recognizing that under the amended Code, "the second and third prongs of the ordinary course defense have become disjunctive rather than . . . conjunctive").

The "subjective prong" centers upon "whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent.'"  *ACP Ameri-Tech*, 2012 WL 481582, at *8 (quoting *Lightfoot v. Amelia Maritime Svcs. Inc. (In re Sea Bridge Marine, Inc.)*, 412 B.R. 868, 872 (Bankr. E.D. La. 2008)).  In analyzing this prong, "courts have come to a rough consensus as to what factors are most important.  Typically, courts look to the length of time the parties were engaged in the transaction in issue, whether the amount or form of tender differed from past practices, whether the creditor engaged in any unusual collection activity, and the circumstances under which the payment was made (i.e. whether the creditor took advantage of the debtor's weak financial condition)."  *Compton v. Plains Mktg., LP (In re Tri-Union Dev. Corp.)*, 349 B.R. 145, 150 (Bankr. S.D. Tex. 2006) (collecting cases).

The "objective prong" concerns whether the payments are consistent with the "customary terms and conditions used by other parties in the same industry facing the same or similar problems." *Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Nat. Gas Corp. (In re Gasmark, Ltd.)*, 158 F.3d 312, 317 (5th Cir. 1998); *see also Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 368 (5th Cir. 2002). On this prong, the Fifth Circuit has approvingly quoted the Seventh Circuit in finding that "'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and . . . only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope" of this prong. *Gulf City Seafoods, Inc.*, 296 F.3d at 368 (citing *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032-33 (7th Cir. 1993) (Posner, J.)).

Harney's arguments and evidence—the parties' agreements and the history and pattern of payments—spoke to the subjective prong; no evidence was provided as to the objective prong.

In his Response to Summary Judgment, Plaintiff insisted that Harney failed to carry its burden in numerous respects. One argument was that KLN was in the furniture business and therefore debts for restructuring services were not "ordinarily" incurred by it. Response to Summary Judgment, ¶¶ 16-30. "[T]he debt owed to the Defendant for restructuring-related services was not a normal business transaction for the Debtors, and fundamentally was not—and can never be—in the ordinary course of the Debtors' business. The Debtors' business was the production and sale of furniture." Response to Summary Judgment, ¶ 20.

In addition, Plaintiff asserted that the $50,000 day-of-bankruptcy payment was not "ordinary" because it was made "in response to extraordinary duress and coercion." Response to Summary Judgment, ¶¶ 31-35. At the Summary Judgment Hearing, Plaintiff also challenged the

day-of-bankruptcy payment because unlike the other payments, it was a round number, paid two invoices at once, and was made on the day bankruptcy was filed. *See* Summary Judgment Hearing Tr. at 30.

Plaintiff also pointed to Harney's inside access to KLN's books and the repeated modifications of payment terms as evidence of an extraordinary relationship. At the Summary Judgment Hearing, Plaintiff argued that "[b]y repeatedly modifying the payment terms [between it and KLN], in direct response to [KLN's] financial condition . . . [Harney] danced its way out of the ordinary course with this debtor." *Id.* at 31. In other words, based on its privileged access to KLN's books by virtue of its role as restructuring consultant, the modifications of the payment terms in force between the parties leading up to bankruptcy should not been seen as part of an "ordinary course" of business between the two, even if similar adjustments in payment terms by other types of creditors might support an ordinary course defense.

### b. The Court's Summary Judgment Ruling

The Court granted summary judgment to Harney on most of the Preference Period payments. In specific, the Court granted summary judgment as to all but the payments made on the invoices of September 24 and October 8, 2011, in the total amount of $42,994.19, and the day-of-bankruptcy payment made on the invoices of November 12 and November 19, in the total amount of $50,000. The Court's reasoning can be summarized as follows.

### i. Debts incurred in the ordinary course.

On the overarching issue raised by Plaintiff, as to whether the debts were "incurred" in the ordinary course, the Court rejected Plaintiff's contention that debt incurred for restructuring consulting was inevitably "extraordinary" for KLN, because its "business was the production and sale of furniture." Response to Summary Judgment, ¶ 20.

Basic principles of interpretation teach that Plaintiff's interpretation of the "debt incurred" element of the "ordinary course" defense is unsustainable. The "debt incurred" element does not present a particularly difficult problem of interpretation. The Code's language for how an "ordinary course" debt must be incurred—"in the ordinary course of business or financial affairs of the debtor and the transferee"—precisely mirrors the Code's language for the "subjective" prong of how an "ordinary course" payment can be made. *See* 11 U.S.C. § 547(c)(2), (c)(2)(A). The phrase should therefore be interpreted similarly in both contexts. Identical language should be interpreted identically where possible—a maxim particularly true when, as here, the two uses occur in close proximity to one another. *See, e.g.*, *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 501 (1998) (noting "the established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning"). To meet the "debt incurred" element of this affirmative defense, all that is required is that a debt be incurred in a "subjectively" ordinary course of business, just as a transfer is protected if it is made in the "subjectively" ordinary course of business. In both instances, the test is whether there is a discernable pattern in the parties' "subjective" relationship, within which pattern the challenged debts and transfers are "ordinary." *See, e.g.*, *Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1124 (9th Cir. 2007) (noting that court must determine whether "the debt and its payment are ordinary in relation to past practices between the debtor and this particular creditor" (quoting *Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.)*, 971 F.2d 396, 398 (9th Cir. 1992))); *Rushton v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)*, 500 B.R. 635, 643 (B.A.P. 10th Cir. 2013) (surveying case law and concluding that the issue is whether debt was "incurred ordinarily between [the parties]," and "whether the transaction [by which the debt was incurred] was a

typical arms-length creation of debt in the open market").[3]  Plaintiff attempts to shoehorn a different, more stringent standard into this phrase in the "debt incurred" context than the meaning it holds in the "payment made" context.  That effort must fail, as a plain matter of textual interpretation.

Thus, applying that legal conclusion to the facts of this case, if the Preference Period debts were incurred consistently with how the pre-Preference Period debts were incurred, they pass the "debt incurred" portion of the test.  *ACP Ameri-Tech*, 2012 WL 481582, at *8.  The uncontroverted evidence shows that this is the case, because the debt incurred by KLN to Harney prior to the Preference Period was incurred as a result of restructuring services provided to KLN under the engagement letter, and the debt that was repaid during the Preference Period was incurred for the same type of services and in a generally consistent fashion.

In addition to being the only sustainable interpretation of the text of the Code, this result accords with the policy and purpose of this defense, as it has been articulated by numerous courts including the Fifth Circuit:  to encourage parties to continue doing business with the debtor even when potential financial failure is on the horizon.  "Without this defense, the moment that a debtor faced financial difficulties, creditors would have an incentive to discontinue all dealings with that debtor and refuse to extend new credit.  Lacking credit, the debtor would face almost insurmountable odds in its attempt to make its way back from the edge of bankruptcy."  *Gulf City*, 296 F.3d at 367; *see also Barnhill v. Johnson*, 503 U.S. 393, 402 (1992) (noting that purpose of this defense is to "encourage creditors to continue to deal with troubled debtors on

---

[3] If there is no pattern between the parties prior to the preference period, courts have by necessity frame the inquiry somewhat differently.  *See, e.g.*, *Ahaza*, 482 F.3d at 1125-27 (discussing and collecting cases).  That is not relevant here, however, because there is an established course of dealing between the parties.

normal business terms"). Indeed, if professionals who give advice to distressed firms, including restructuring consultants such as Harney, are not also incented to do business with troubled entities, the "almost insurmountable odds" mentioned by the Fifth Circuit in *Gulf City* would become impossible odds. And unlike the creditor in the *Armstrong* case relied on by Plaintiff, Harney was not a casino that, if allowed to keep the challenged payments, would be "encourag[ed] . . . to issue credit to troubled debtors so they may, with the odds against them, gamble away their remaining assets and increase their debt." *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 525 (8th Cir. 2002).[4] In fact, the uncontroverted evidence in the record showed that—as one would expect—Harney provided restructuring services to try to steady KLN's business and finances, not to gamble it all away. In short, Harney's efforts to continue an ordinary course of dealing with the debtor up through the bankruptcy filing should

---

[4] Another case relied upon by Plaintiff is similarly dis-analogous. *Woodard v. Godsey (In re C.J. Spirits, Inc.)* involved the re-payment of a debt incurred by an insider of the debtor making a capital infusion. 238 B.R. 889, 892-93 (Bankr. M.D. Fla. 1999). *But see In re Fulghum Constr. Corp.*, 872 F.2d 739, 744-45 (6th Cir. 1989) (holding that a creditor's cash infusions were protected). Debt to Harney was incurred by services performed, not by cash infusions.

One case that involves a consultant arrangement, *Perlstein v. Saltzstein (In re AOV Indus.)*, 62 B.R. 968 (Bankr. D.D.C. 1986), involves such an unusual transaction that it sheds no light on the relationship between KLN and Harney. In *AOV*, the payment at issue was received by former insider of the debtor pursuant to a five-year "consultant"/"founder's compensation" agreement, which the court characterized as "much more than a bare employment contract," in part because payments were due "whether [creditor] was able to provide the consulting services or not." 62 B.R. at 976. Contrary to Plaintiff's suggestion, the *AOV* court's extended analysis of the particularities of the agreement at issue might suggest that the court would have found a more normal consulting contract to be ordinary course.

Finally, in these cases, there is also substantial reason to question whether the transactions were arm's length or were in fact consistent with any prior course of dealing between the parties. *C.J. Spirits*, 238 B.R. at 892 (characterizing the creditor as a "principal" of the debtor); *id*. at 893 (noting lack of detailed evidence of "prior repayment practices with respect to loans made by" the creditor); *AOV*, 62 B.R. at 971 n. 2 (noting creditor had sold ownership interest in debtor in another part of the same agreement); *id*. at 976 n. 7 (noting creditor did not claim he actually provided any consulting services under the agreement). Those concerns are not present here.

be rewarded just as much as the efforts of any other creditor.  The debts incurred by KLN to Harney are very much at the heart of what the ordinary course defense is intended to protect.

It is true, as Plaintiff notes, that professionals may have privileged access to information concerning the debtor's affairs, and this may be relevant to some factual determinations concerning "ordinariness"—that is, concerning whether the debts were incurred or the payments made pursuant to a "collusive arrangement[ ] designed to favor the particular creditor during the debtor's slide into bankruptcy." *Gulf City*, 296 F.3d at 367.  But there is simply no basis—in the text of the Code, in the case law, or even in arguments of policy—for access to financial knowledge about the debtor becoming an ipso facto bar to "ordinary course" defenses.  There is every indication that Harney incurred rights to payment from KLN by providing services throughout the relevant time frame in a way that was "ordinary" as between it and KLN.  On the facts of this case, Plaintiff provided no evidence suggesting that Harney's access to KLN's books caused the services provided or the payments made for those services to be extraordinary

Thus, as explained at the Summary Judgment Hearing, there was (and is) no genuine issue of material fact that *all* of Harney's debts were *incurred* in the ordinary course of business.

ii.     Transfers made in the ordinary course

As far as the transfers, most of them were clearly made in the ordinary course. Specifically, the Court found that most of the Preference Period payments were "consistent with the timing, manner, and amount of the payments made to Harney during the pre-Preference Period."  Summary Judgment Hearing Tr. at 47.  Mindful of the fact that the ordinary course "defense cannot be reduced to a mathematical equation," *ACP Ameri-Tech*, 2012 WL 481582, at *8, Harney brought forth a substantial amount of consistent and uncontroverted evidence, which leaves no room for doubt as to most of the payments.  As noted above, the timing can be

summarized:

Pre-Preference Period

Average from invoice to payment:  Seven business days.

Total range:  Within three to nineteen days.

Preference Period

Average from invoice to payment:  6.25 business days.

Total range:  Within two to ten days.

As these numbers suggest (and more fine-grained analysis confirms), there was unquestionable consistency in the timing of the pre-Preference Period and Preference Period payments, at least as to the payments on which summary judgment was granted.

The mere fact that the agreements under which the parties operated were amended on several occasions was not in itself sufficient to remove these payments from the "ordinary course."  True, neither the pre-Preference Period nor the Preference Period payments fully accorded with the parties' agreements—indeed, most payments before and during the Preference Period were later than contemplated in the agreements.  But against that baseline of tardiness, there is no meaningful difference between the pre-Preference Period payments and the Preference Period payments (leaving aside the payments excepted from summary judgment, which are discussed below).  *See In re Xonics Imaging Inc.*, 837 F.2d 763, 766-67 (7th Cir. 1988) (Posner, J.) (noting that even when a creditor accepts payment after a contractual payment deadline, that does not necessarily indicate that it is "a case where the tottering debtor had decided to put one creditor ahead of the others" and thus a candidate for avoidance; the debtor might "simply be doing the same thing he had been doing before he began to totter," that is, continuing on an ordinary course).

In sum, Harney carried the "subjective" prong of the ordinary course defense as to all but a few of the payments, namely the day-of-bankruptcy payment and the payments on the invoices of September 24 and October 8, 2011.  As to the day-of-bankruptcy payment, there were issues of material fact concerning the conditions under which the payment was made, i.e., whether it was obtained coercively or in response to undue pressure.  As to the payments on the invoices of September 24 and October 8, 2011, the Court's own review had raised a concern as to whether they were "made in a manner that was strictly consistent with the payments that were made earlier."  Summary Judgment Hearing Tr. at 48.  Evaluation of these payments was left for factual determination at trial.

### 3. Trial

Thus, as explained above, only three payments were at issue at Trial:  The payment on the September 24 invoice, the two payments on the October 8 invoice, and the day-of-bankruptcy payment in the sum of $50,000.  At Trial, Plaintiff and Harney put on evidence concerning Harney and KLN's dealings, particularly around the time of the contested payments.  At the conclusion of the Trial, the Court took its judgment under advisement, and invited the parties to file a post-trial brief addressing the legal issues raised at Trial, as they have both done.

As evidence at Trial showed, and as the Court now finds, the Preference Period payments fit the elements of avoidable transfers under section 547(b) of the Bankruptcy Code.  In light of this, the issues remaining to be determined are as follows:

1. As to the day-of-bankruptcy payment, does Plaintiff have standing to seek recovery of this payment, and has he put the transfer at issue in this litigation? (Part A below.)

2. As to all the remaining contested payments, were these payments made in the

17

ordinary course of business, as defined by section 547(c)(2) of the Bankruptcy Code?  (Part B below.)

3.  Were any payments protected by Harney's having extended "new value" to KLN, pursuant to section 547(c)(4) of the Bankruptcy Code?  (Part C below.)

4.  Were any payments rendered non-recoverable in whole or in part because of a retainer held by Harney on the date of payment?  (Part D below.)

The Court's findings and analysis on these issues are discussed below.

## III.  ANALYSIS AND HOLDINGS

### A.  Standing and Pleading

Harney states that Plaintiff does not have standing to seek avoidance of the $50,000 day-of-bankruptcy payment, and that even if he has standing, Plaintiff's pleadings were insufficient to put these funds at issue.

#### 1.  Standing

Plaintiff complains that Harney raised the issue of standing late in the day.  Plaintiff's Post-Trial Brief, ¶ 12.  But that does not matter.  Standing is "a jurisdictional requirement, and [the Court is] . . . obliged to ensure it is satisfied regardless whether the parties address the matter."  *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 354 (5th Cir. 2008).

Generally, after the confirmation of a Chapter 11 plan, the bankruptcy estate ceases to exist, and for that reason, the ability of the debtor-in-possession or trustee to pursue causes of action on behalf of the estate is lost.  *See United Operating*, 540 F.3d at 355.  But if a plan provides for the "retention and enforcement" of claims, claims may survive and be prosecuted "by the debtor, by the trustee, or by a representative of the estate appointed for such purpose."

11 U.S.C. § 1123(b)(3)(B).  The Fifth Circuit has instructed that there must be "specific and unequivocal" language preserving claims, such that generic language of the "any and all claims" variety does not suffice.  *United Operating*, 540 F.3d at 355-56.

The Fifth Circuit elaborated this standard in the recent *Texas Wyoming* decision, making clear that claims may be retained by language in either the disclosure statement or the plan. *Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Tex. Wyo. Drilling, Inc.)*, 647 F.3d 547, 550-51 (5th Cir. 2011).  The *Texas Wyoming* court also provided guidance on just how "specific" the retention of claims needs to be.  In that case, the court approved the retention of claims identified most clearly in the disclosure statement, where the debtor stated an intention to preserve claims against "[v]arious pre-petition shareholders of the Debtor" for "fraudulent transfer and recovery of dividends paid to shareholders," and "valu[ed] the claims at approximately $4 million."  *Texas Wyoming*, 647 F.3d at 549; *see also Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449 (5th Cir. 2012) (discussing the case law and finding claims retained).  The Court applies the principles of contract interpretation in order to determine whether claims have been specifically and unequivocally preserved, and to resolve any ambiguities.  *See MPF Holdings*, 701 F.3d at 457.

In *Texas Wyoming*, the categorical list of defendants and theories of recovery clearly included the cause of action that was actually urged, and the court found the retention language was sufficiently specific—"far more specific" than the language that the court had rejected in *United Operating*.  647 F.3d at 551.  The keystone of the doctrine is notice, "to put 'creditors on notice of any claim [the debtor] wishes to pursue after confirmation.'"  *Id*. at 550 (quoting *United Operating*, 540 F.3d at 355).

At first glance, the claim retention language in KLN's Plan appears to satisfy the *Texas*

*Wyoming* standard.   Section 6.5 of the Plan authorizes Plaintiff (as Liquidating Trustee) to liquidate the "Liquidating Trust Assets," which are defined in Section 2.1 of the Plan to include "Avoidance Actions," which are in turn defined as follows:

> **"Avoidance Actions"** means any and all rights, claims and causes of action arising under any provision of chapter 5 of the Bankruptcy Code, including claims for payments made to creditors within 90 days of the Petition Date that may be avoidable under 11 U.S.C. § 547.

Plan § 2.1.   Standing alone, this language would be clear and unequivocal in giving Plaintiff standing to pursue *all* preference actions.

But there is additional language.   The broad first sentence of Section 6.6 of the Plan states that "all Avoidance Actions . . . including . . . preference claims under section 547 [of the Bankruptcy Code] . . . shall be preserved and transferred and assigned to the Liquidating Trust." Plan § 6.6.   The narrower second sentence of this section states, however, that Plaintiff "shall be authorized and shall have the power to bring any and all *such Avoidance Actions for payments reflected on Exhibit 'D.'"   Id.* (emphasis added).   The Exhibit D list of Preference Period payments made to Harney does not include the $50,000 transfer made on the day of filing, and this language in the second sentence of Plan § 6.6 suggests that the Plan *only* authorized Plaintiff to sue for those payments listed on Exhibit D.   That is, the disclosed lists could well be read as the full and exclusive list of contested transfers.   The underlying interpretive principle is "expressio unius est exclusio alterius"; the inclusion of one thing is the exclusion of the other. *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 346 (3d ed. 2011).   Under this principle, where one item of a given type is included, the exclusion of another is seen as intentional.   The limiting language of Section 6.6 is at odds with the entirely open-ended language of Section 6.5.   The Plan is, in other words, ambiguous.

One way to resolve this ambiguity is to look at the Disclosure Statement, which was

admitted into evidence without objection. The first sentence of Section X.G of the Disclosure Statement tracks the open-ended language of the first sentence of Section 6.6 of the Plan, and thus favors Plaintiff. The second sentence of that section of the Disclosure Statement, however, reads as follows:

> On the Effective Date, the Liquidating Trust shall be authorized and shall have the power to bring any and all Causes of Action *including* Avoidance Actions for payments reflected on Exhibit "D."

Disclosure Statement § X.G (emphasis added). No such Exhibit D was actually attached to the Disclosure Statement, as Plaintiff concedes. *See* Plaintiff's Post-Trial Br., ¶ 16. The list of Avoidance Actions was instead attached to the Disclosure Statement as Exhibit XI.A, as explained elsewhere in the Disclosure Statement. *See* Disclosure Statement § XII.A. As with the other list, this list omits the $50,000 transfer. *See* Disclosure Statement, Ex. XI.A. The Disclosure Statement language states that the preserved causes of action only "includ[e]" the listed actions, and the Court reads this "including" inclusively, declining Harney's invitation to find that the "including" in Section X.G of the Disclosure Statement should be read as "including only" rather than "including without limitation." In the Court's view, if the similar sentence in Section 6.6 of the Plan had similarly used the word "including," there would have been no ambiguity, and Plaintiff would clearly have standing to sue Harney for the $50,000 transfer. But of course, the Plan did no such thing; instead it gave a list that arguably appeared to present *all* of the possible claims.

The remaining question is, then, does KLN's Disclosure Statement resolve the ambiguity in the Plan?

The purpose of the doctrine of "specific and unequivocal" retention is to guarantee notice to creditors of "their benefits and potential liabilities" under a Chapter 11 plan. *Tex. Wyo.*, 647

F.3d at 550 (quoting *United Operating*, 540 F.3d at 355).  Harney argues with some force that the $50,000 gap in KLN's list fails to accomplish this goal, and that the claim for the $50,000 transfer was forfeited by the omission of this transfer from the list of retained actions in the Plan and Disclosure Statement.

On this close issue, however, in the Court's judgment, the best reading of the Plan and Disclosure Statement and their attachments is that KLN wished to preserve avoidance actions very generally.  By listing some—even if not all—payments to Harney, KLN gave ample notice that payments to Harney might be the subjects of attempted recovery.  What was included was sufficient to put Harney (and any other party in interest) on notice that Plaintiff might pursue not only the specific listed payments but also the $50,000 day-of-bankruptcy payment—a payment that Harney was well aware of, even if KLN omitted it.  Also, a sophisticated restructuring consultant such as Harney would be well aware that this day-of-bankruptcy payment was certain to be a likely contestant for avoidance, more so than many of the payments that were listed.  In fact, it is the unusual, last-second nature of this payment that likely caused it to be omitted from the list of the more typical payments made in the Preference Period.  The opposite ruling here would have the effect of discouraging the filing of such lists in favor of the more general retention language approved of in *Texas Wyoming*.  It seems preferable to encourage more rather than less disclosure, even if the more detailed disclosure includes the occasional, relatively minor error.

None of this is to condone Plaintiff's failure to attach the (properly labeled) exhibit referenced in the Disclosure Statement, or, worse, his failure to clearly state that there might be other transfers not specifically listed that were preserved.  The *Texas Wyoming* standard permits broad preservation of claims, but *only* when the scope of the preserved claims is specifically

delineated.   KLN and Plaintiff come perilously close to forfeiting their preservation of the $50,000 avoidance claim under this standard.   Nonetheless, the evidence in this case as a whole leads the Court to the conclusion that this claim was retained.  *Cf. McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335-36 (5th Cir. 1995) (holding that although plan was ambiguous, parol evidence suggested that a challenged claim not included in a list was nonetheless retained by the liquidating trustee).

A final note is that insofar as Harney intended to argue that Plaintiff should be judicially estopped from recovering this payment, *see* Closing Statement at 13-14, that argument must fail. Judicial estoppel requires, among other things, that the party to be estopped take "clearly inconsistent positions."  *Texas Wyoming*, 647 F.3d at 552.  KLN and Plaintiff did not do so.  As explained above, any inconsistency between the transfers listed in the exhibits and pleadings, and the transfers actually sought to be recovered, is not "clear[ ]," in the judgment of this Court.  And there is no indication anywhere than KLN or Plaintiff was "'playing fast and loose' with the courts."  *Id.* (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988).

### 2.  *Pleading*

Harney also argues that Plaintiff's Complaint failed to state a claim as to the $50,000 day-of-bankruptcy payment.  As Harney notes, the $168,594.85 listed as the attempted recovery in the Complaint is $50,000 less than what Plaintiff apparently is actually seeking.  Missing is the day-of-bankruptcy payment.   And despite this lack being discussed at the Summary Judgment Hearing, Plaintiff never amended its Complaint to include the payment.

Harney's argument must fail for several reasons.

First, on its face, the Complaint does not list specific payments, but rather merely states that it is intended to capture transfers made within ninety days of the Petition date, of which the

day-of-bankruptcy payment is clearly one.  And while the $168,594.85 amount demanded does not include this amount, that number is given equivocally and as a minimum only.  Complaint, ¶ 7 (seeking "the total of at least $168,594.85").  In other words, the Complaint is so bare-bones and open-ended that it hardly can be said to omit or include the $50,000.

Although Harney never filed a motion to dismiss the complaint, there might have been a basis for such a dismissal.  Courts have required more detail from preference complaints than contained in Plaintiff's Complaint.  In most cases, it appears at a minimum that complaints should include basic details of the alleged preference payments, an explanation of the relationship between the parties, and basic facts to support the other required elements—in other words, at least "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Crescent Res. Litig.  Tr. v. Pruet (In re Crescent Res., LLC)*, No. 09-11507, 2012 WL 195528, at *4 (Bankr. W.D. Tex. Jan. 23, 2012) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).  The Complaint here can hardly be said to have met that basic standard.

But even if the Complaint was arguably inadequate as filed, that does not now bar Plaintiff from recovering the contested payments.  The federal rules provide for belated and even implied amendment of pleadings to include issues in fact tried.  Federal Rule of Civil Procedure 15(b)(2), applicable to this matter by virtue of Federal Rule of Bankruptcy Procedure 7015, states: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  *But failure to amend does not affect the result of the trial of that issue*."  Fed. R. Civ. P. 15(b)(2) (emphasis added).  Under Rule 15(b), Plaintiff's failure to

formally move to amend does not determine the result here.  If the issue was actually tried by consent of the parties, then the absence of that issue from the pleadings can be overlooked, both at summary judgment and at trial.  *See Handzlik v. United States*, 93 F. App'x 15, 17 (5th Cir. 2004) (not selected for publication) ("[W]hen 'both parties squarely address[ ] [a claim] in their summary judgment briefs,' it may be argued that the complaint was constructively amended." (quoting *Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 663 (7th Cir. 1998))).

Trial by consent may either be express or implied.  In this case, Harney expressly consented to trial concerning the day-of-bankruptcy payment.  Both Harney's and Plaintiff's Pretrial Order includes the day-of-bankruptcy transfer as a contested payment.  *See* Plaintiff's Amended Pre-Trial Order [Dkt. No. 29]; Defendant's Pre-Trial Order [Dkt. No. 30].  "Express consent may be . . . incorporated in a pretrial order."  *Silver v. Nelson*, 610 F. Supp. 505, 519-20 (E.D. La. 1985); *Mongrue v. Monsanto Co.*, 249 F.3d 422, 427 (5th Cir. 2001) ("A party has presented an issue in the trial court if that party has raised it in either the pleadings or the pretrial order, or if the parties have tried the issue by consent under Federal Rule of Civil Procedure 15(b)."); *Marsh Inv. Corp. v. Langford*, 620 F. Supp. 880, 883 (E.D. La. 1985) (finding that express consent was present because issue was raised in pretrial memorandum, issue had been "in this case from the beginning," and "no unfair surprise or prejudice will result from the court's consideration" of it).  "It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issue and evidence to be presented at trial."  *Fitch Marine Transp., LLC v. Amer. Comm. Lines, LLC*, No. 09-4450, 2010 WL 5057516, at *5 (E.D. La. Dec. 3, 2010) (quoting *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996)).  While here there was not a "joint pretrial order signed by both parties" but rather separate pretrial orders, one submitted by each party, both pretrial orders included the day-of-bankruptcy payment

as a matter in controversy for trial, and neither identified the lack of an amendment to the complaint as an issue to be resolved.

Thus, any objection to the pleadings was waived by the inclusion of the day-of-bankruptcy payments in the parties' Pre-Trial Orders, with no indication of an objection to these payments being tried. The Pre-Trial Orders had the effect of "supersed[ing]" the arguably deficient active pleading. *McGehee*, 101 F.3d at 1080. Although at the outset of Trial, Harney mentioned that it wished to maintain its challenge to the pleadings, the Pre-Trial Order submitted by Harney does not contain that challenge. Moreover, the Trial record shows that Harney put on extensive and well-prepared evidence concerning the day-of-bankruptcy payments, and hotly contested the story Plaintiff sought to tell about those payments. In other words, Harney's trial conduct supports the position in Harney's Pre-Trial Order, to the effect that Harney consented to trying the day-of-bankruptcy payment alongside the other challenged payments.

The truth is, even if Harney had stringently objected to all evidence of the day-of-bankruptcy payment, it would have been an exercise in futility. Plaintiff could simply have moved to amend, and, given the utter lack of prejudice as well as the ample notice to Harney (since the summary judgment stage) that this transfer was at issue, the Court would have had no basis to refuse.[5] Even if Harney had thoroughly maintained its objection to the day-of-

---

[5] Of course, Plaintiff could simply file a separate avoidance suit for recovery of the $50,000, as it in fact has done. *See* Complaint, Adv. Proc. No. 13-1153, Dkt. No. 1 (Nov. 21, 2013). The present suit was pending at that time that new complaint was filed, but Plaintiff presumably brought that additional adversary proceeding (on the eve of the two-year anniversary of KLN's bankrutpcy filing) to avoid the running of the two-year statute of limitations, *see* 11 U.S.C. § 546(a)(1)(A), in case the Court found against its having preserved this avoidance claim in the present adversary proceeding. It would be senseless—as well as contrary to the federal rules—for the Court to refuse to rule on the day-of-bankruptcy transfer based on the full record that is before the Court, simply to force the parties to re-present their arguments and evidence as to that same transfer in a future trial.

bankruptcy payment being put at issue, the Court would have considered "the interests of justice," most importantly the fact that defending the additional transfer did not prejudice Harney. *Moody v. FMC Corp.*, 995 F.2d 63, 66 (5th Cir. 1993). "In the absence of a showing of prejudice, the objecting party's only remedy is a continuance to enable him to meet the new evidence." *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177 (5th Cir. 1992) (quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982)). Here, no such continuance was sought, nor was one needed, given Harney's thorough and energetic (if ultimately unsuccessful) attempt to defend the day-of-bankruptcy payment.

Though Plaintiff's course of action in neglecting to amend its Complaint seems needlessly risky, there is no basis to penalize Plaintiff with the draconian remedy of denying recovery. The thinly sketched Complaint may or may not have included the day-of-bankruptcy payment if considered on its own, but after considering the substantial proceedings of this case, particularly including the Pre-Trial Order filed by Harney itself, the day-of-bankruptcy payment was succesfully put at issue, and was tried.

The Court now turns to Harney's affirmative defenses.

## B.  Ordinary Course of Business

As noted, the following payments remained at issue at Trial:  the three payments on the invoices of September 24 and October 8, 2011, in the total amount of $42,994.19, and the day-of-bankruptcy payment in the total amount of $50,000. Harney argues that these payments are protected as transfers made in the "ordinary course of business" under section 547(c) of the Bankruptcy Code. To sustain this defense, Harney has the burden of showing that each transfer:

> was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee and such transfer was—
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).  As with the payments upon which the Court decided at summary judgment, the Court finds that these transfers to Harney were "incurred" in the "ordinary course."  *See supra*, § II.C.2.b.

Harney did not put on any satisfactory evidence to meet the "objective" standard of section 547(c)(2)(B).[6]  Thus, the inquiry left for the Court is whether Harney successfully carried its burden of showing that the payments met the "subjective" standard—that is, whether they were "made in the ordinary course of business or financial affairs of the debtor and the transferee."  11 U.S.C. § 547(c)(2)(A).  In evaluating whether the "subjective" standard applies, the Court compares the timing and manner of the payments made before the Preference Period with the timing and manner of those made during the Preference Period.

As to the two payments made on the invoices of September 24 and October 8, 2011, these payments were made partially by wire transfer and partially by check.  In specific, the $23,351.26 invoice of September 24, 2011 was paid by check on October 4, 2011.  The $19,642.93 invoice of October 8, 2011 was paid partially by check of $12,142.93 and partially by wire transfer of $7500, on October 18, 2011.

No other payment was made by check either before or during the Preference Period.  Nor did the parties' written agreements allow for payment by check—indeed, the agreements

---

[6] Doing so might or might not have helped Harney.  Certainly, it is not uncommon for professionals to be paid on their outstanding invoices the day of or the day before a bankruptcy filing, particularly if their retention agreements so provide.  Indeed, evidence shows that the debtor's attorneys received a substantial payment that same day.  Whether this practice is common enough to constitute an "ordinary course" for the industry of crisis consultants and bankruptcy attorneys is simply not developed in the record, and the Court's ruling today should not be interpreted as a ruling on that practice generally, or whether such evidence would be sufficient as a preference defense.

specified (in italics) that payments should be "*by wire transfer*." In addition, the evidence is clear that at least one reason these payments were made as they were (by check and in part) was that KLN was short of cash, and Harney knew it. Harney has failed to show that, under the circumstances, these payments were made in the "ordinary course" as between these parties. It is true that the method of payment alone does not render a payment "non-ordinary," as cases cited by Harney show. *See, e.g., In re Brown Transp. Truckload, Inc.*, 161 B.R. 735, 740 (Bankr. N.D. Ga. 1993). But the method of payment is certainly probative, and the *reasons* for the change in method even more so. Of course, this determination is highly fact-specific. Here, taken altogether, the circumstances, including the facts related in Mr. Fyffe's testimony, reinforce the sense that the payments were not ordinary. The burden to show ordinariness was Harney's, and the Court finds that Harney failed to carry it.

As to the day-of-bankruptcy payment: Based on the evidence before it at summary judgment (affidavits and copies of emails), the Court suggested that, as Harney notes in its Closing Statement, the $50,000 payment was the "result of a very natural and proper negotiation between two skilled professionals." Summary Judgment Hearing Tr. at 41; Closing Statement at 6. But the Court left the question as to whether the ordinary course defense applied, because this issue needed factual development.

The contradictory Trial testimony concerning the dealings between Harney and KLN (and KLN's counsel) leading up to bankruptcy does not convince the Court that Harney's professionals acted with any impropriety. Counsel for KLN recollected that Mr. Milligan conditioned his turning over reports under Harney's control on Harney's receipt of payments for services invoiced and due. Mr. Milligan flatly testified that he imposed no such condition. The emails were more consistent with Mr. Milligan's story, but Ms. Tamasco, counsel for KLN, gave

specific and credible testimony to the contrary.  Because its ruling will rest on other grounds (as discussed below), the Court need not sort out this disagreement between professionals.  But it bears mentioning that there is nothing improper about a professional seeking payment for services, including on the eve of bankruptcy (although of course the professional may risk avoidance under some conditions), and what appears to have happened here (as far as can be drawn out of the limited available evidence) does not rise to the level of impropriety or coercion, even if it might be sufficient to depart from an "ordinary course."

Nonetheless, Harney's defense is unsuccesful.  Clearly, the timing of this last payment was dictated by the fact that KLN was filing bankruptcy the next day.  Unlike most or all of the prior payments, the payment was made quite soon after the latest invoice (which was dated November 19), was made in payment of two separate invoices, and was significantly higher than any other single payment, whether before or during the Preference Period.[7]  Each of these facts weighs against ordinariness.  Moreover, there is no pattern of payments established under the renewed retention of November 8 against which to measure the ordinariness of this payment. The November 8 retention letter could have provided for an eve-of-bankruptcy pay arrangement, but did not.  While the terms of the governing engagement letter do not necessarily delineate the exact bounds of ordinariness, they are probative, particuarly when there was not yet a pattern of payments under this renewed engagement letter, against which the eve-of-bankruptcy payment could be assessed.

Finally, it again bears emphasizing that Harney had the burden.  The Court finds that it failed to carry that burden.

---

[7] The next highest payment appears to have been on May 3, 2011, in the amount of $29,310.06. During the Preference Period, the highest was on October 4, 2011, in the amount of $23,351.26. *See* Def. Trial Ex. 5.

### C.  New Value

Harney asserts that it is entitled to credit the new value it extended to KLN in the form of unpaid consulting services provided on the day of bankruptcy against whatever amounts the Court finds unprotected by the ordinary course of business defense.  In order to assert the "new value" defense, Harney must show that after the challenged transfers, it "gave new value to or for the benefit of the debtor (A) not secured by an otherwise avoidable security interest; and (B) on account of which new value the debtor did not make an otherwise avoidable transfer to or for the benefit of such creditor."  11 U.S.C. § 547(c)(4); *see SGSM Acquisition*, 439 F.3d at 241-42.

The Court finds that Harney meets this standard.  There is uncontroverted evidence in the record through Milligan's testimony that Harney provided $2280 in uncompensated services on November 22, 2011, and that this new value was not secured.  Harney is entitled to credit for its extension of new value.

### D.  Retainer

Harney notes that it held a $20,000 retainer, and argues—in a single paragraph with little explanation—that any recoverable amount should be subject to offset against that amount.  Harney's Closing Statement at 5.

It is true that the Code offers some protection for professionals who maintain retainers sufficient to cover any fees that come due during the pre-petition period.  *See* 11 U.S.C. § 547(b)(5).  Where a distressed client has the cash to fund such a retainer, professionals sometimes use it as a way to avoid the possible "Catch-22" or "Hobson's choice" of either (a) being unpaid as of the petition date and thus being a creditor of the estate (and thus arguably not "disinterested" as required by the Code of those who would be retained for post-petition services), or (b) being paid shortly prior to the petition date and thus being the likely target of a

31

preference investigation.  *See generally* Jay Westbrook, *Fees & Inherent Conflicts of Interest*, 1 AM. BANKR. INST. L. REV. 287, 300-03 (1993) (explaining this "Catch-22").

But this abstract possibility bears no relevance to the facts presented.  Mr. Milligan testified at Trial, in response to the Court's question, that the retainer was already applied to the other debt owed under the agreement between KLN and Harney.  The portion of Harney's claim to which the retainer was applied was a secured claim to the extent of the offset.  11 U.S.C. § 506(a)(1).  The remainder of Harney's claim must then be unsecured, and therefore preferred by the payments.  In addition, counsel for Harney (wisely) waived this argument by representing at Trial that he was no longer contesting that Plaintiff met the test of section 547(b)(5), meaning that Harney, as an unsecured creditor, received more than it would have under a liquidation under Chapter 7 of the Code.

Harney's effort to credit the retainer against the amounts here contested must therefore fail.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, the Court holds that Harney should retain the amount of $2280 as a payment protected by the "new value" exception, and that Plaintiff should otherwise be entitled to recover the transfers made on the invoices of September 24 and October 8, 2011, in the amount of $42,994.19, and the day-of-bankruptcy payment, in the amount of $50,000.  Plaintiff's net recovery is, thus, $90,714.19.